[No. 10603.   Department One.   November 11, 1912.]

NATIONAL LUMBER & BOX COMPANY, *Appellant*, v. GRAYS HARBOR COMMERCIAL COMPANY *et al.*, *Respondents.*[1]

PRINCIPAL AND AGENT—RELATION — CONTRACT — CONSTRUCTION— PARTNERSHIP. An agreement between box manufacturers was intended to establish an agency for the handling of their manufactured products, and does not create a partnership between them, where it in terms created an agency which was placed in charge of a board of principals upon which each party had a single representative, and the board was empowered to appoint a general agent to act as the agent of the principals "severally and respectively" in making sales and collections, the expressed purpose being to limit the production and fix prices, it being expressly agreed that the agency was to be "several" with no power to bind the principals jointly or create any joint obligation.

PARTNERSHIP—ESTOPPEL TO DENY—EVIDENCE—SUFFICIENCY. Defendants, who were box manufacturers, are not estopped to deny that their selling agency, created with limited power to sell goods and fix prices, was not a partnership, and the plaintiff, a box manufacturer who sold the agency goods, is sufficiently shown to have had notice of the nature of the agency and its powers, where it appears that it was invited to join in the creation of the agency, its sales manager saw the written agreement limiting the powers of the

[1]Reported in 127 Pac. 577.

agency, and its officers fully considered the proposition and declined to enter into the arrangement; there being no evidence that the defendants held themselves out as partners.

Appeal from a judgment of the superior court for Chehalis county, Irwin, J., entered January 20, 1912, upon findings in favor of the defendants, dismissing an action on contract, after a trial on the merits to the court.  Affirmed.

*Bridges & Bruener*, for appellant.

*Austin E. Griffiths*, for respondent Grays Harbor Commercial Company.

*Morgan & Brewer*, for respondent Northwestern Lumber Company.

*Danson, Williams & Danson* (*O. G. Follevag*, of counsel), for respondent Washington Mill Company.

Gose, J.—This action is prosecuted to recover a balance due upon goods which the plaintiff alleges it sold to the defendant corporations, as copartners, doing business under the name of Northern Box Manufacturers' Agency.  A judgment of dismissal was entered.  The plaintiff has appealed.

The respondent corporations, together with numerous other corporations and individuals, in March, 1902, entered into a written agreement, to continue in force for the term of five years, which recited that each of the contracting parties was a manufacturer of boxes and box materials, and in which it was agreed that a northern box manufacturers' agency should be, and by the agreement was, created; that the purposes of the agency were, to facilitate the distribution and sale of the manufactured products of the manufacturers, the principals under the agreement, such products consisting of boxes and box material; to reduce the cost of the sale and distribution thereof; to protect the principals from loss through sales to irresponsible purchasers; to enlarge to the fullest extent the market for their products; "to promote, encourage, and increase the demand for such product;" "to

regulate the amount of the manufactured product;" to establish and maintain fair, reasonable, and just general prices; to accumulate a fund to be used to promote and carry out the purposes of the agency as set forth in the agreement; and to fix and establish the quota to be furnished to the agency by each of the principals; and providing that no principal should manufacture any product in excess of such quota.

The agreement further named a board of principals, and stipulated that it should be known as the board of principals of the "Northern Box Manufacturers' Agency," and that they should, when acting as such board, be constituted the "agent of each of said principals, severally and respectively, with such powers only as are herein granted;" that the board of principals should have no power to represent or act for the said principals "jointly, or any number of them jointly, or have any power whatsoever to act for, or represent, or in any way bind, any principal jointly with any other principal, or in any way otherwise than separately and severally as to each principal respectively;" that nothing in the agreement should be construed to create any "joint obligation" as to the principals "or any number thereof," or to authorize the board of principals to create any such "joint obligation or liability;" that each principal should be liable only for his proportion or quota of any obligation created by the board of principals, and that the board of principals should have no power to contract or incur any obligation or liability whatsoever, under any circumstances, in excess of the cash on hand, and that it should have no authority to bind any of the parties to the agreement "except when regularly assembled and acting as a board;" that each principal should pay to the board of principals the sum of ten cents per thousand feet on the whole number of feet of lumber constituting its respective quota; and should also pay to the board an additional sum of forty cents per thousand feet on every thou-

sand feet of manufactured lumber sold by it each month; that
the board of principals should have the power, when it deemed
it necessary, to demand and collect from each principal an
additional monthly payment of not to exceed fifty cents per
thousand feet on all manufactured lumber sold by each of
the principals in any calendar month after the execution of
the agreement; that all moneys received by the board of
principals under the agreement should be used, invested, or
disbursed by it for carrying on the transactions of the agency,
or for the expenses of the maintenance and operation thereof;
that whenever $25,000 should have accumulated in the hands
of the board of principals, it might, if it deemed it advisable,
distribute it, or any portion of it, in the proportions provided
in the agreement to such principals as should be entitled
thereto; that the board of principals should appoint and re-
move at pleasure a general agent who should, under its direc-
tion, "supervision, and control, act as the agent of each of
the principals under this agreement, severally and respec-
tively, for the sale of all manufactured product covered by
the agreement;" that the general agent should have only such
powers "as are in this agreement expressly conferred upon
him, or such as may be expressly conferred upon him by said
board of principals by resolution duly passed at a regular
meeting of said board and entered on the minutes thereof;"
that the board of principals should do "any and all things
proper, necessary, and feasible to build up the largest pos-
sible volume of business and trade for all of the parties to
this agreement;" that it should have the power "to fix and
establish the price or prices at which all manufactured prod-
uct shall be sold, and no product shall be sold by any princi-
pal to any one, for or at other or different prices which shall
in any way be less in amount or lower than that so fixed
and established by said board of principals;" that it should
have the power "to fix the entire amount of the manufactured
product to be manufactured, and to fix and apportion to
each principal respectively the quota or proportion of such

entire amount to be manufactured by it or him on the basis
of the apportionment fixed by said agreement;" and that the
board of principals should, in so far as it was able or as it
was practicable to do so, "equalize orders and the demand
for the manufactured product proportionally among the
principals." The agency was terminated in July, 1906, by
a resolution of the board of principals.

The appellant's contention is that it sold to the respond-
ents, under the name of Northern Box Manufacturers'
Agency, certain boxes and cannery cases; that their agree-
ment created a copartnership; or that, if it did not create
that relation, the respondents are estopped by their conduct
to deny that such relation was established. It concedes,
however, that its transaction was with the Northern Box
Manufacturers' Agency, hereafter called the agency, acting
through its manager who had been appointed by the board of
principals. The agreement contains about seventeen pages
of typewritten matter, and we have set forth only the provi-
sions essential to a correct understanding of the issues.

It seems too clear to require extended argument, that the
parties intended to establish an agency for the handling of
their manufactured products, and that they did not intend
to, and in fact did not, create a partnership as between those
who united in the instrument. The agency was placed in
charge of a board of principals upon which each party had a
single representative, and this board was given authority to
appoint a general agent with authority, subject to the super-
vision of the board, to act as the agent of each of the prin-
cipals, "severally and respectively," for the sale of all manu-
factured products "covered by the agreement;" to collect
"all proceeds of sales" passing through the agency and sub-
ject to the limitation that he should only have such powers as
were "expressly conferred upon him" by the agreement, or
such as "may be expressly" conferred upon him by the reso-
lution of the board "passed at a regular meeting of said
board and entered on the minutes thereof." The purposes of

the agency, as declared in the instrument, are to facilitate the distribution and sale of the "manufactured products of the said manufacturers," the principals in the agreement; to reduce the cost of sale and distribution; to increase the demand and enlarge the market for their manufactured products; to limit the quantity manufactured by the several principals, and "to fix and establish the price or prices at which all manufactured products shall be sold." In short, the purpose was to limit the production and fix the prices of the output of the mills represented in the agreement. It was expressly provided that the board was the agent of each of the principals "severally," and that it should not have the power to "represent or act for the principals jointly or any number of them jointly," or to bind any principal "jointly with any other principal," or other than separately and severally, and that it should not "create any joint obligation as to the said principals or any number of them." The only fair and reasonable construction of the instrument is that it created an agency and not a partnership.

Upon the second contention, i. e. that the respondents are estopped by their conduct to dispute the partnership relation, the court found: "That from the evidence adduced in this case, the court finds that, if the plaintiff did not have actual knowledge of the facts, that no such liability could be created, its information was such as to necessarily put it upon inquiry as to the power and authority of the agency to create such liability." It is argued that this finding is not supported by the evidence. It suffices to say that we have read the evidence on this question, and that our conclusion is that the court would have been warranted in finding that the appellant knew the actual relation between the respondents and the agency. The appellant's manager and sales manager attended some of the meetings of the board, and it was invited to join the agency. Its sales manager testified that he was trying to get the fullest information about the agency; that he may have looked at the written agreement; that it was

probably presented to him by some member of the agency with a view of inducing his principal to join the agency; and that *he* never intended to join it "unless I could show to my superior officers that it would be an advantage to them to do so." In April, 1905, before the date of the alleged sale, the appellant's manager wrote the general manager of the agency, that he would not join the agency; that he could not see "where we would be benefited in joining . . . under the present conditions," and that "we are willing to give our word or bond if necessary that we will maintain association prices." It is apparent, we think, that the appellant carefully considered the agency agreement, and then declined to become a party to it. In no other way could its officers as business men determine the feasibility of becoming a member of the agency. The evidence is too clear on this question to merit further consideration.

There is no evidence that the respondents held themselves out or permitted themselves to be held out as copartners, or that the appellant was led by their conduct to believe that it was selling its goods to them. It follows that a liability cannot be predicated upon the principle of equitable estoppel. *Thompson v. First Nat. Bank,* 111 U. S. 529. The law does not surprise parties into a partnership against their will, in the absence of ratification or estoppel. 30 Cyc. 252; 31 Cyc. 1574-5-6.

The appellant contends further that the respondents are liable because the agency did not disclose all the material circumstances attending the transaction. This position again assumes that the respondents have by their conduct estopped themselves to rely upon the restrictions which they so carefully put upon the authority of the agency. There can be no estoppel when the party asserting it knew that no authority in fact existed, or when as a reasonably prudent man he should have known that fact, as where he was acquainted with the facts that should have suggested an inquiry which, if pursued, would have led to the truth. 31 Cyc.

1243, 1244; *Graton & Knight Mfg. Co. v. Redelsheimer*, 28 Wash. 370, 68 Pac. 879.

We think that the appellant knew that the agency, acting through its general manager, was intending only to act in the capacity of its factor the same as it was acting for its members; and that it knew the purposes of the agency and the extent of its authority. It follows that there can be no recovery against the respondents.

Whether the agreement constituted a combination in restraint of competition, and if so, what effect it would have upon the appellant, we need not consider, as the point is neither briefed nor argued.

The judgment is affirmed.

MOUNT, C. J., CROW, PARKER, and CHADWICK, JJ., concur.